GARSAUD, Judge.
Suit was brought by the City of New Orleans and the Department of Safety and Permits against the State of Louisiana, the Louisiana Department of Corrections, and C. Paul Phelps, Director of Corrections, on September 30, 1976, pursuant to R.S. 33:4728, which provides for the enforcement of building and zoning regulations by a municipality. The City sued to enjoin the use of Jackson Barracks by the State Department of Corrections as a prison for the housing and/or treatment of convicted criminals, and from the transfer of convicted felons under the control of the Department of Corrections of the State of Louisiana to the state-owned facility located at Jackson Barracks. The petition specifically alleges that on a certain date, the Department of Corrections established a Special Treatment Unit on the site at Jackson Barracks for emotionally disturbed inmates of the state penal system. The City maintained that such use was in violation of city zoning ordinances because that area of the City of New Orleans is zoned RD-3, Two-Family Residential, and such a designation prohibits the use of any land within the district as a prison.
In response to this petition for an injunction, the State has filed an exception of prescription, contending that under appropriate statutes the City has failed to complain timely about the use of Jackson Barracks to house prisoners. The trial court maintained the State’s exception of prescription. The City has appealed from that ruling.
The question of whether the City has timely complained about the nonconforming use in an RD-3 residential district can only be resolved by a review of the history of *83 Jackson Barracks and its use by the Department of Corrections, as it is the initial use by the Department of Corrections which ultimately led to this particular litigation.
It appears from the testimony that in February, 1969, a Work Release Program was instituted at Jackson Barracks through a memorandum of understanding entered into between the Military Department of the State of Louisiana and the Department of Corrections of the State of Louisiana. There is no doubt that the use of Jackson Barracks as a work-release center, as the State contends, has been continuous, uninterrupted, and notorious since February 1969. The initial use involved approximately 14 inmates for the purpose of renovating existing buildings. This number eventually grew to approximately 300 inmates under the Work Release Program when the federal courts ordered the prison population reduced at the state penitentiary. This increase to about 300 occurred about 1976. For the last two years, the inmate population has been approximately 200.
With regard to this use, it is clear that the use would otherwise violate the city zoning ordinance which, in effect, prohibits a prison in a two-family residential district, if it were not for the question of prescription. However, under R.S. 9:5625 as amended by Act 415 of 1962, the City had two years to complain about that use, which it failed to do. The applicable statute at that time read as follows:
“A. All actions, civil or criminal, created by statute, ordinance or otherwise, which may be brought by parishes, municipalities or their instrumentalities or by any person, firm or corporation to require enforcement of and compliance with any zoning restriction, building restriction or subdivision regulation, imposed by any parish, municipality or their instrumentalities, and based upon the violation by any person, firm or corporation of such restriction or regulation, must be brought within two years from the first act constituting the commission of the violation . . . and provided further that with reference to violations of use regulations all such actions, civil or criminal, must be brought within two years from the date the parish, municipality or their instrumentality first had knowledge of such violation .
“B. In all cases where the prescription provided for herein shall have accrued, the particular property involved in the violation of the zoning restriction, building restriction or subdivision regulation shall enjoy the same legal status as land uses . . made non-conforming by the adoption of any zoning restriction . (Emphasis added.)
With regard to the knowledge requirement of the City, £he testimony shows that the City, through its police department and health department, had the requisite notice of the nonconforming use. In oral argument before this Court, the City did not strenuously object to the conclusion that, insofar as the work release program is concerned, the City has no remedy and can seek no relief, as two years have expired from the time the City had knowledge of the utilization of Jackson Barracks for a Work Release Program. Thus, prescription has accrued, prohibiting the City from now complaining about the nonconforming use as a Work Release Center.
The point of difference, then, becomes the introduction in 1976 of the medical unit for mentally-disturbed inmates. It should be noted that these are not inmates of the Work Release Program who may require medical attention, but are convicted felons previously housed at the state penitentiary who are transferred to this special unit at Jackson Barracks.
R.S. 9:5625 was amended by Act 54 of 1972 to state as follows:
“A. All actions civil or criminal, created by statute, ordinance or otherwise, except those actions created for the purpose of amortization of nonconforming signs and billboards enacted in conformity with the provisions of R.S. 33:4722, which may be brought by parishes, municipalities or their instrumentalities or by any person, firm or corporation to require enforcement of and compliance *84 with any zoning restriction, building restriction or subdivision regulation, imposed by any parish, municipality or their instrumentalities, and based upon the violation by any person, firm or corporation of such restriction or regulation, must be brought within two years from the first act constituting the commission of the violation; provided, that where a violation has existed for a period of two years prior to August 1, 1956, except those actions created for the purpose of amortization of non-conforming signs and billboards enacted in conformity with the provisions of R.S. 33:4722, the action must be brought within one year from and after August 1, 1956, and provided further that with reference to violations of use regulations all such actions, civil or criminal, except those actions created for the purpose of amortization of non-conforming signs and billboards in conformity with the provisions of R.S. 33:4722, must be brought within two years from the date the parish, municipality and their properly authorized instrumentality or agency if such agency has been designated, first had been actually notified in writing of such violation. Except as relates to nonconforming signs and billboards, any prescription heretofore accrued by the passage of two years shall not be interrupted, disturbed or lost by operation of the provisions of this section.
“B. In all cases where the prescription provided for herein has. accrued, the particular property involved in the violation of the zoning restriction, building restriction or subdivision regulation shall enjoy the same legal status as land uses, construction features of buildings or subdivisions made nonconforming by the adoption of any zoning restriction, building restriction or subdivision regulation. However, the governing authority may provide for the removal of nonconforming signs and billboards in accord with the provisions of R.S. 33:4722.” (Emphasis added.)
For our purposes, the major change in R.S. 9:5625 introduced by Act 54 of 1972 is that the notice to the municipality must now be in writing in order for the two-year period to begin to run. If it can be shown that the introduction of the medical unit is a new nonconforming use and is not simply an extension of the prior legally-obtained nonconforming use, then the two-year prescriptive period does not bar the City from pursuing its injunction under this statute, as amended, as the City has brought its suit well within two years from the time of the establishment of the medical unit, and further there is no evidence to show that any written notice of this change was sent to the City which would have enabled the prescriptive period to begin to run.
This brings us to the primary issue in the case, that is, whether the nonconforming use of the Work Release Program which had been obtained as a result of its introduction in 1969 and the City’s failure to complain timely is a use which has converted Jackson Barracks to a facility that can house inmates of the state penitentiary of any type or description or, simply, has Jackson Barracks, by the legal establishment of the nonconforming Work Release Program, become another state penitentiary? If it has, then of course the use as a medical treatment unit is merely a permissible extension, and the City cannot complain.
The City argues that, with the inception of the medical treatment program for mentally disturbed inmates, and the concomitant erection of guard towers and additional wire fences of greater height than previously existed, the use of Jackson Barracks has changed substantially, and a new nonconforming use exists, against which the City can request an injunction under R.S. 33:4728 and R.S. 9:5625.
To determine whether this is simply a continuation of the nonconforming use established by the Work Release Program, it is helpful to review the testimony of the witnesses. On direct examination, Mr. C. Paul Phelps, the Secretary of the Department of Corrections, testified regarding an interoffice memorandum between former Superintendent Joseph Giarfcusso and Major Henry Morris, Chief of Detectives, of the *85 ¿w Orleans Police Department. This in-eroffice memo was dated June 12, 1969. Secretary Phelps said:
“As I said, this is the document that is signed by Major Morris, and the result of a conference which starts off, ‘Work Release Center, Metropolitan New Orleans area, located in Jackson Barracks, comes under the direction of the State Department of Corrections. Mr. John J. Kelly is the local Administrator of the Work Release Program. Mr. Kelly resides at one of the permanent quarters at Jackson Barracks. He can be reached at telephone number 271-6262, extension 361, after 4:30 p. m., at 271-6271. At present he has no home phone number. The program began locally on February 24, 1969, when Mr. Kelly came to Jackson Barracks with Angola convicts to renovate the Barracks. The Work Release Program did not start until about three weeks ago. The main purpose of the Work Release Program is to find jobs for those convicts who would be eligible for parole six to eight months. This program was selected through the classification at the state penitentiary at Angola.’ They would go to the jobs in the morning and report back in the afternoon.” (Tr. 9-10)
The following dialogue took place on cross-examination of Secretary Phelps:
“THE WITNESS:
Our agreement with the Military Department was that in return for certain facilities that they would provide them, inmates to provide basic maintenance functions that go on at Jackson Barracks, grass cutting, carpenter work, this sort of thing.
“CROSS EXAMINATION BY MR. CRESSY:
“Q I asked you, did your agreement with them give you a right to establish a prison at Jackson Barracks?
“A Our agreement with them gave us the right to establish a Work Release facility. I’m not sure what your definition of a prison is.
“Q You’re better qualified — well, would Work Release establishments make a prison out of a facility?
“A Does Work Release make a prison? No, you can have Work Release at prisons or have Work Release outside of prisons. You could have both ways.
“Q Because of the Act of 1968, 187 of 1968 gave you the right to have Work Release in prisons and outside of prisons?
“A That’s right.
“Q So Jackson Barracks wasn’t a prison with a Work Release?
“A If a prison is where you don’t allow people to leave voluntarily, it’s a prison.
“Q Say that again.
“A If a prison is a facility where you do not allow people to come and go as they want to, it would be a prison.
“Q And you don’t allow them to come and go here?
“A They come — we do not allow them to come and go as they want to, as you and I can come and go in a building.
“Q When was the medical unit treatment established in Jackson Barracks?
“A Oh, within the last — I don’t know, year or so. I don’t know the exact details.
“Q Is that different from Work Release?
“A Yes, sir.
“Q The medical treatment people, they are not on Work Release?
“A That’s correct.
“Q They don’t come and go under any circumstances, do they?
“A Hopefully not.
“Q But they are not allowed to go and come, they don’t go through the gate and go to work, they stay there and are guarded with armed guards, is that correct?
“A Same as other inmates are, yes sir.” (Tr. 30-32)
Further, on rebuttal examination, Mr. Phelps testified as follows:
“Q Mr. Phelps, are Work Release inmates permitted — you have a Work Release Program at Jackson Barracks, is that not correct?
*86 “A Yes, sir.
“Q And that is also related to a maintenance program, is that correct?
“A That’s correct.
“Q Are all inmates who are in the Work Release or maintenance program permitted to leave the facility or whatever?
“A No, sir. Those on Work Release, they sign out to go to work, sign in when they come out. They are not allowed to go and come at any time they choose to. Those on maintenance are not allowed to work outside of the facility, but work for the Department of Corrections, the National Guard. They also may not leave and go on their own free will.
“Q Was this maintenance program established in 1969?
“A Yes, sir.
“MR. DAVIS:
I have no further questions.
“THE COURT:
These people are forceably detained within the institution?
“THE WITNESS:
Yes, sir.
“THE COURT:
According to the Rules and Regulations of those authorities and that is the prison authorities, I presume, the Department of Corrections, is that correct, sir?
“THE WITNESS:
Yes, sir.
“THE COURT:
Okay.” (Tr. 35-36)
Finally, on cross examination of Mr. Lloyd Lamy, the Captain at the Department of Corrections at Jackson Barracks, we find the following:
“Q When did the medical treatment — do you have anything to do with the medical treatment facility out there?
“A Yes, sir.
“Q What do you do with that?
“A I’m Chief Security down there. I’m the head captain.
“Q When a medical treatment facility was — when was a medical treatment facility established there? What, about a year ago?
“A Yes, sir.
“Q Did you all have to substantially increase the amount of security you used?
“A Yes, they increased the staff. Yes, sir.
“Q Built a fence?
“A Yes, sir.
“Q Put a tower up?
“A Yes, sir.” (Tr. 44-45)
On the basis of this testimony, it appears the trial court concluded that, because prisoners under the Work Release Program were housed at Jackson Barracks, that facility was converted to a prison, and as the medical unit simply housed other prisoners, the use has not changed. Accordingly, he sustained the exception of prescription, as more than two years had elapsed since the inception of Work Release in 1969.
This is not an easy case to resolve, but it is our view that the trial court was in error in its conclusion that a new use has not been undertaken by the introduction of the medical unit for mentally disturbed prisoners. We do not believe that the Work Release Program at Jackson Barracks converted that facility to a state penitentiary. The most that happened is that the State, through the City’s failure to pursue its legal remedies, has converted Jackson Barracks to a facility to be used for a special program developed in the penal system, that of Work Release. Work Release is part of a theory of penology dealing with rehabilitation for purposes of returning the prisoner to society as a contributing member. Although one would have to admit that when an individual participates in a Work Release program, he is still a prisoner or an inmate or is imprisoned, nevertheless it remains true that the facility in which he is imprisoned may or may not be a penitentiary, and his imprisonment or confinement in a particular building(s) does not convert that building(s) to a state penitentiary. If that were the case, and Jackson Barracks were *87 converted to a prison, then the State could, without any interference, simply move the state penitentiary from Angola to Jackson Barracks. We do not believe the location of the major state penitentiary was intended by the legislature to be determined by such a circuitous route. The introduction of the medical treatment center for mentally disturbed prisoners is not part of the rehabilitative theory ingrained in the Work Release Program. The introduction of these inmates at Jackson Barracks is an essential change and not merely a continuation and permissible expansion of its former use. The State itself was aware of a dramatic change in the use when, concurrently with the introduction of the mental unit, it erected guard houses and the new fence. It is a change in kind, and not a change in degree.
For these reasons, we reverse the lower court’s decision sustaining the exception of prescription, and remand for a trial on the merits consistent with this opinion.

REVERSED.